RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 5 / 9 / 12

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

YVONNE MUTH-WILLETT,
        Appellant

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER
OF SOCIAL SECURITY,
        Appellee

CIVIL ACTION
SECTION "P"
1:11-cv-1547

JUDGE DEE D. DRELL
MAGISTRATE JUDGE JAMES D. KIRK


REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Yvonne Muth-Willett ("Muth-Willett") filed an application for disability insurance benefits ("DIB") on October 8, 2008, alleging a disability onset date of July 31, 2007 (Tr. p. 88) due to bipolar disorder, bowel movement problems, anxiety attacks, seizures, abnormal brain wave activity, blackouts, and confusion (Tr. p. 104). The Social Security Administration ("SSA") denied that claim (Tr. p. 63).

A hearing was held before an administrative law judge ("ALJ") at which Muth-Willett appeared with a vocational expert ("VE"). The ALJ found that, although Muth-Willett suffers from major depressive disorder, hysterectomy secondary to cervical cancer, and a seizure disorder (Tr. p. 17), she has the residual functional capacity to perform a full range of work at all exertional levels except that she cannot work around hazardous machinery or at unprotected heights, and she is limited to simple tasks and should work with things rather than people (Tr. p. 19). The ALJ found there are a significant number of jobs in the national economy

which Muth-Willett can perform, such as kitchen helper, hand packager, and automobile detailer (Tr. p. 22), and concluded that Muth-Willett was not disabled at any time through the date she last had disability insured status on June 30, 2009 (Tr. p. 22).

Muth-Willett requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 1) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Muth-Willett next filed this appeal for judicial review of the Commissioner's final decision. Muth-Willett raises the following issues for review on appeal (Doc. 9):

> 1. The ALJ's residual functional capacity assessment is not supported by substantial evidence; the ALJ failed to consider relevant evidence regarding Muth-Willett's bowel incontinence.

> 2. The ALJ misstated the evidence by alleging that Muth-Willett did not complain of serious bowel problems until January 2010.

> 3. The ALJ's misinterpretation of the medical evidence led to a flawed credibility finding as to Muth-Willett's testimony regarding her bowel incontinence.

> 4. The ALJ failed to properly evaluate the medical opinion evidence; she improperly rejected the opinion of Dr. Scott Cantwell and improperly relied on only part of Dr. Thrasher's opinion;

> 5. The ALJ's residual functional capacity assessment failed to properly account for Muth-Willett's moderate limitations in social functioning and concentration, persistence, and pace.

> 6. The ALJ failed to fulfill her duty to develop the record; she failed to obtain mental health treatment records for the 17 month period preceding her decision.

The Commissioner responded to Muth-Willett's appeal (Doc. 10), and Muth-Willett filed a reply (Doc. 11). Muth-Willett's appeal is

now before the court for disposition.

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(i), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

### 1. Medical Records

Muth-Willett was given an EEG by Dr. H. Stanley Culbertson in June 2004, due to her migraine headaches (Tr. pp. 159-160). Dr. Culbertson found that, although Muth-Willett had some subcortical electrical dysfunction, it was a nonspecific pattern and there were no discrete or convincing "epileptiform" (resembling epilepsy) abnormalities (Tr. p. 160).

In July 2005, Muth-Willett had severe epigastric and periumbilical pain with radiation to her back, as well as nausea and vomiting (Tr. pp. 146-158). Muth-Willett was diagnosed with cholelithiasis (production of gallstones) and cholecystitis

3

(inflammation of the gallbladder)   (Tr. pp. 150, 178).

In October 2005, Muth-Willett was examined by Dr. Peter Milder, a general practice doctor, who noted her complaints of back and neck pain as well as headaches, and the fact that she was going through a divorce (Tr. p. 143). Dr. Milder found Muth-Willett had spasms and tenderness in her neck and her thoracic and lumbar spine, but fairly good range of motion; he prescribed Zanaflex, Vicodin, and Protonix for reflux (Tr. p. 143). June 2006 x-rays of Muth-Willett's left shoulder did not reveal any problems (Tr. p. 144). X-rays of her cervical spine also did not reveal anything that would account for her complaints of left shoulder pain radiating down her arm (Tr. p. 176).

In September 2007, Muth-Willett had an intrauterine pregnancy at 20 weeks gestation, vaginal bleeding, and a questionable cervical mass (Tr. p. 147). In December 2007, Muth-Willett was at 31+ weeks gestation, and she had vaginal bleeding but normal ultrasounds, and had a mass on her cervix which was biopsied (Tr. p. 146). Muth-Willett was diagnosed with cervical cancer in December 2007 and January 2008 (Tr. pp. 171, 189), delivered her child (Tr. p. 165), then underwent a hysterectomy (Tr. pp. 165, 170), and was treated with radiation in February and March 2008 (Tr. pp. 161-165, 168-169). Radiation treatment was interrupted for a few days by diarrhea which was not resolved by Immodium (Tr. p. 164).

In April 2008, Muth-Willett's pelvic exam showed no lesions, bleeding or masses (Tr. p. 194). Barium enemas in April and June

4

2008 showed no evidence of a constricting lesion or a fixed polypoid mass (Tr. pp. 192, 198).   In June 2008, Muth-Willett complained of hot flashes, anxiety, bowel incontinence, urinary incontinence when laughing, and pain with intercourse, but her rectum was found to have normal tone, no fistulas were found, and she was prescribed Zoloft (Tr. p. 193).

Muth-Willett received counseling in August 2008 (Tr. p. 205). She was taking Wellbutrin and she reported increased irritability and agitation as well as increased energy and goal direction; the Wellbutrin was discontinued (Tr. p. 205) and Depakote was prescribed (Tr. p. 204).   In September 2008, Muth-Willet reported discontinuing the Depakote due to gaining a pound, but also stated she was calmer, not depressed or suicidal, and her mood was elevated (Tr. p. 203).   Muth-Willett was diagnosed with bipolar disorder II[1] and prescribed Trileptal (an anticonvulsant).   A week later, Muth-Willett again reported less irritability and being calmer (Tr. p. 202).   Muth-Willett was diagnosed with bipolar disorder II with ongoing irritability and depression, and her Trileptal was increased (Tr. p. 202).   In October 2008, Muth-Willett stated her child had noticed a difference in her and she reported feeling more sensitive (Tr. p. 202).   It was noted during

---

[1] Bipolar II Disorder is defined by a pattern of depressive episodes shifting back and forth with hypomanic episodes, but no full-blown manic or mixed episodes.   MEDLINEplus Health Information, National Institute of Mental Health: Bipolar Disorder, available at http://www.nimh.nih.gov/health/ publications/bipolar-disorder/complete-index.shtml (a service of the U.S. National Library of Medicine and the National Institutes of Health).

the treatment session that Muth-Willett was over-talkative, her mood was expansive, her speech was rapid and she did not stay on topic, but she reported her anger outbursts here greatly decreased, she did less yelling and arguing, and she had stopped destroying property (Tr. p. 202).

In December 2008, Muth-Willett was examined Dr. W. Scott Cantwell, an internist, who noted she was taking Lithium and Trileptal (Tr. p. 216). Muth-Willett related complaints of bipolar disorder, bowel movement problems, anxiety attacks, seizures, abnormal brain wave activity, and blackouts (Tr. p. 216). Muth-Willett reported last working one and a half years ago in customer service. Dr. Cantwell noted that Muth-Willett denied headaches, gastrointestinal problems, genitourinary problems, and musculoskeletal problems (Tr. p. 217). Muth-Willett reported having seizures, memory loss, and depression, but no mood changes, nervousness, anxiety, difficulty concentrating, or difficulty sleeping at night (Tr. p. 217). Dr. Cantwell noted that Muth-Willett needed multiple repeat instructions during the exam (Tr. p. 217). Dr. Cantwell diagnosed obesity, bipolar disorder, seizure disorder, depression, a history of cervical cancer and psychomotor retardation (Tr. p. 218). Dr. Cantwell concluded she had an essentially normal physical exam, but had difficulty processing instructions during the physical exam and seemed to have some psychomotor retardation (Tr. p. 218). Dr. Cantwell stated it is unlikely that Muth-Willett can respond appropriately to questions, carry out and remember instructions, and potentially hold a

6

conversation (Tr. p. 218). Dr. Cantwell further found Muth-Willett can sit, walk, and/or stand for a full workday, can lift-carry objects of 20 pounds or more, can hold a conversation, can respond appropriately to questions, and can carry out and remember instructions (Tr. p. 218).

In January 2009, a physical residual functional capacity assessment of Muth-Willett was completed by Dr. Hollis T. Rogers from a review of Muth-Willett's medical records (Tr. pp. 222-229). Dr. Hollis found Muth-Willett has no exertional limitations, but should avoid working around hazardous machinery and heights.

In February 2009, Muth-Willett underwent a mental status exam with Fay C. Thrasher, Ph.D., a psychologist (Tr. p. 231). Dr. Thrasher noted Muth-Willett's history of being diagnosed with bipolar disorder at age 19, her report of being aggressive and moody when not on medication and foggy when she takes medication, her history of difficulty keeping a job, her current medications of Lexapro, Risperidone, and Depakote, and her educational history of high school and two years of technical college (Tr. pp. 231-232). Dr. Thrasher diagnosed: Axis I-recurrent major depressive disorder without psychotic features, Axis IV-psycho social stressors (unemployment, depression, history of substance abuse (when young), and physical problems), and Axis V-a GAF score of 65.[2]   Dr.

_____

[2] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client.  Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35

7

Thrasher concluded that Muth-Willett's estimated intellectual ability appeared to be in the average range, she appeared to be able to perform detailed, complex work tasks, she should be able to maintain attention and concentration to perform simple work tasks for two hours at a time, her ability to respond to supervision and interact appropriately with co-workers was uncertain due to aggressive and irritable social behavior, her ability to sustain effort and persist at a normal pace over a routine 40 hour workweek was uncertain, and her ability to tolerate the stress, pressure, and social environment of a work setting was questionable due to her depression, history of substance abuse, and difficulty become stabilized on medication (Tr. pp. 233-234). Dr. Thrasher stated that Muth-Willett appeared capable of managing her money (Tr. p. 234).

In February 2009, a mental residual functional capacity

---

(4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. The first number indicates the patient's current GAF, while the second number indicates the highest score reported in the previous year. DSM-IV-TR at 32-34. The GAF scale goes from 0-100; a score of 61-70 means there are some mild symptoms or there is some difficulty in social, occupational or school functioning, but is generally functioning pretty well, and has some meaningful interpersonal relationships. DSM-IV-TR, at 34. Also, Boyd v. Apfel, 239 F.3d 698 (5th Cir. 2001).

assessment and a psychiatric review technique form were completed from a review of Muth-Willett's medical records by Jack Spurrier, EdD (Tr. pp. 236-239, 240-252). Spurrier noted that Muth-Willett suffers from a recurrent manic-depressive disorder without psychotic features (Tr. p. 243), and found she has mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace (Tr. p. 250).

In January 2010, Muth-Willett was examined for complaints of loose stools, mild incontinence, back pain and headaches (Tr. p. 257). Muth-Willett was diagnosed with obesity, chronic diarrhea, back pain, and headaches (Tr. p. 257).

2. November 20, 2009 Administrative Hearing

Muth-Willett waived her right to be represented at her administrative hearing (Tr. p. 31). Muth-Willett testifed that she was 31 years old, 5'2" tall, weighed 190 pounds, and lived with her husband and two children (ages 2 and 8) (Tr. pp. 33-34). Muth-Willett testified that she receives child support (Tr. p. 34). Muth-Willett testified that she does not smoke, drink alcohol, or take illegal drugs (Tr. p. 34); she used to drink and use illegal drugs but stopped doing so eight years ago, when she became pregnant with her first child (Tr. p. 34).

Muth-Willett testified that she finished high school and attended two years of technical college, for which she received a certificate in Industrial Process Technology (Tr. pp. 34-35). She testified her technical education was designed specifically for

9

Savannah Riverside (a nuclear plant in South Carolina), and is not useful elsewhere (Tr. p. 35). Muth-Willett testified that she has always had customer service jobs and last worked about two and a half years ago (Tr. pp. 35-36, 37). Muth-Willett testified that she can read, write, do basic arithmetic, and make change, she drives two to three times a week, and she owns an automatic transmission vehicle (Tr. p. 36). Muth-Willett testified that it is about a 60 mile round trip to Wal Mart from her home (Tr. pp. 36-37).

Muth-Willett testified that she last worked at Sears for eight months, and left due to complications with her (last) pregnancy (Tr. p. 37). Muth-Willett testified that she has been a waitress, which involves taking and remembering orders and using a cash register (Tr. p. 38). Muth-Willett also testified she has worked at Sears, H&H Appliances, Ivan Smith Furniture, and Domino's Pizza; those jobs involved talking to and working with customers (Tr. pp. 38-39). At the pizza restaurant, Muth-Willett cooked, answered the telephone, folded boxes, prepared the pizzas for delivery, and washed dishes (Tr. p. 40).

Muth-Willett testified that her bowels stay very loose and she does not have the ability to control and hold them, so she has to have immediate access to a bathroom when she feels an urge to go or she will have an accident (Tr. pp. 41-42). Muth-Willett testified she has that urge two or three times a day (Tr. p. 43). Muth-Willett testified she has had that problem since she underwent radiation treatment, which lasted eight weeks (Tr. p. 42).

10

Muth-Willett testified she has not had any recurrence of cancer (Tr. p. 42).

Muth-Willett testified that she takes Depakote (Tr. p. 43) for seizures; her last seizure was about three weeks ago (Tr. p. 44). She testified that Depakote makes her brain feel cloudy (Tr. p. 44). Muth-Willett testified that her last doctor, a Dr. Smith, told her she has to either live with medication side-effects or "be bipolar" (Tr. pp. 45-46). Muth-Willett testified that her black-outs are not a medication side-effect, and are different from but connected to her seizures (Tr. p. 46). Muth-Willett testified that, after a seizure, she feels confused and it takes about half an hour for her to feel normal again (Tr. p. 46).

Muth-Willett testified that she takes Risperdan to curb her aggravation and anxiety, but it makes her feel very loopy and sluggish; she has difficulty concentrating and remembering things (Tr. p. 47). She takes Depakote for both her seizures and her bipolar disorder (Tr. p. 47).

Muth-Willett testified that her doctor said she is "hyper-bipolar" because she has very distinct highs and lows that are very close together, recurring within hours, days or weeks, rather than months (Tr. pp. 47-48). Muth-Willett testified that her depressions usually last weeks, even with her medication (Tr. p. 48). Her highs usually last a few days (Tr. p. 48). Muth-Willett testified that her last "high" episode was about a week and a half ago and lasted three days (Tr. p. 48).

Muth-Willett testified that, during a depressed period, she is

slow to get out of bed and get motivated, she tends to stay in her pajamas all day, and she doesn't get dressed or shower or do much; she snacks rather than eats meals, does not want to go anywhere or see anybody, and just stays in her house (Tr. pp. 48-49).  On her manic days, Muth-Willett testified that she "runs the roads" (Tr. p. 49).  Muth-Willett testified that she has been going to the mental health unit for about a year and a half and receives counseling about once a month (Tr. p. 49); that also they check the effectiveness of her medications by asking her a lot of questions about how she feels (Tr. pp. 49-50).

Muth-Willett testified that she does not have any problems with sitting, standing, walking, lifting, or carrying, but she needs to be in close proximity to a bathroom (Tr. p. 50).  Muth-Willett testified that she visits relatives every six weeks or so (Tr. p. 50) and visits friends about every two weeks (Tr. p. 51). Muth-Willett does not go to church or any meetings, does not work in the yard, and can take care of her personal needs (Tr. p. 51). Muth-Willett testified that she watches television about twelve hours a day, and does not read or have any hobbies (Tr. p. 52). She has problems falling asleep because she worries about things and awakens several times in the night to use the bathroom (Tr. p. 52); she sleeps a total of about six hours a night (Tr. p. 53). Muth-Willett testified that she naps during the day once or twice a week (Tr. p. 53).

Muth-Willett testified she was recently hospitalized for four to five days for pneumonia (Tr. p. 53).  However, the only doctor

she is currently seeing is at the mental health clinic (Tr. p. 53).

Muth-Willett testified that her medication side-effects are confusion, her brain "slows down," and she has difficulty understanding and concentrating (Tr. pp. 53-54). Muth-Willett testified she can interact with and handle a supervisor giving her instructions, if she is in the right mood (Tr. p. 54), can work with others as long as they do not get in her space (Tr. pp. 54-55), and can work with the public (Tr. p. 55). Muth-Willett also testified she can follow simple one or two-step instructions "as long as she can remember them," and agreed she could remember really simple instructions (Tr. p. 55). Muth-Willett testified that she can concentrate and pay attention (Tr. p. 55). However, Muth-Willett testified that crowds make her anxiety level go up so she tries not to shop on Saturdays (Tr. pp. 55-56).

Wendy Klamm testified as a vocational expert ("VE") (Tr. p. 56).[3] Klamm testified that Muth-Willett's past work as an informal waitress was light, semiskilled (SVP 3, DOT[4] 311.477-030), as a furniture salesperson was light, semiskilled (SVP-4, DOT 270-357-030), as a household appliance salesperson was light, semiskilled (SVP-4, DOT 270.357-034, as a pizza baker was medium, skilled (SVP-3, DOT 313.381-014, and as a kitchen helper was medium, unskilled (SVP-2, DOT 318.687-010) (Tr. p. 57). Mut-Willett's job at Domino's Pizza was a combination of both pizza baker and kitchen

---

[3] Klamm's name is not in the Louisiana Licensed Vocational Rehabilitation Counselor licensee database, and her curriculum vitae is not in the administrative record before the court.

[4] Dictionary of Occupational Titles.

helper (Tr. p. 57).

The ALJ posed a hypothetical concerning a person of Muth-Willett's age and education, who has no exertional limitations, but who cannot work around hazardous machinery and heights, and who is limited to simple tasks and working with things rather than with people (Tr. p. 58).  The VE testified that such a person could work as a hand packager (medium, unskilled, SVP-2, DOT 920.587, 1300 jobs in the state economy and 227,915 in the national economy), a kitchen helper (4400 jobs in the state economy and 366,135 in the national economy), or an automobile detailer (medium, unskilled, SVP-2, DOT 915.687-034, 2435 jobs in the state economy and 192,100 jobs in the national economy) (Tr. p. 58).

When the ALJ added the qualification that the person would need to be able take bathroom breaks as needed throughout the day, or that the person might have to miss two or three days a month, the VE testified that such a person would probably not be able to maintain employment under either circumstance (Tr. pp. 58-59).

ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Muth-Willett (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of

14

that process that a claimant is or is not disabled, the sequential process ends. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled. Under the regulations, this means that the claimant bears the burden of proof on the first four steps of the sequential analysis. Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Muth-Willett has not engaged in substantial gainful activity since July 31, 2007 (Tr. p. 17), and that she has severe impairments of major depressive disorder, hysterectomy secondary to cervical cancer, and a seizure disorder, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. pp. 17-18). The ALJ also found that Muth-Willett is unable to perform any or her past relevant work as an informal waitress, furniture sales person, a household appliance sales person, and a pizza baker/kitchen helper (Tr. p. 21).

At Step No. 5 of the sequential process, the ALJ further found that Muth-Willett has the residual functional capacity to perform

15

the full range of work at all exertional levels except as reduced by her inability to work around hazardous machinery or at unprotected heights or do more than simple tasks, and she should work with things rather than people (Tr. p. 19). The ALJ found that the claimant is a younger individual with a high school education; transferability of work skills was immaterial (Tr. p. 21). The ALJ concluded there are a significant number of jobs in the national and state economies which Muth-Willett can perform, such as kitchen helper, hand packager, and automobile detailer (Tr. p. 22) and, therefore, Muth-Willett was not under a "disability" as defined in the Social Security Act at any time through the date she last had disability insured status, on June 30, 2009 (Tr. p. 22).

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994), citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a

16

scrutiny of the record as a whole.   The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.  Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder.  Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."   Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Law and Analysis

Grounds 1, 2 & 3 - Residual Functional Capacity

First, Muth-Willett contends the ALJ's residual functional capacity assessment is not supported by substantial evidence because the ALJ failed to consider relevant evidence regarding Muth-Willett's bowel incontinence.   She further contends the ALJ misstated the evidence by alleging that Muth-Willett did not

17

complain of serious bowel problems until January 2010, and that the ALJ's misinterpretation of the medical evidence led to a flawed credibility finding as to Muth-Willett's testimony regarding her bowel incontinence.

Muth-Willett's burden was to prove that she was disabled within the meaning of the Social Security Act.  That requirement means that she must show a "medically determinable" impairment and that she is unable "to engage in substantial gainful activity". Greenspan v. Shalala, 38 F.3d 232 (5th Cir. 1994), cert. den., 514 U.S. 1120, 115 S.Ct. 1984 (1995); 20 C.F.R. §423(d)(1)(A) and (d)(3); 20 C.F.R. §404.1508; 42 U.S.C. §423(d)(1)(A). A claimant's symptoms will be determined to diminish a claimant's capacity for basic work activities to the extent that the claimant's alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. §404.1529(c)(4).

As noted by the ALJ, Muth-Willett presented very little medical evidence to support her health complaints (Tr. p. 20). The ALJ found Muth-Willett did not complain about bowel problems until January 2010, when she complained to the consultative examiner, Dr. Cantwell (Tr. p. 20).

Muth-Willett suffered from diarrhea in February and March 2008, during her radiation treatment (Tr. pp. 162-164), she again sought treatment for bowel incontinence in June 2008 (Tr. p. 193), she told Dr. Cantwell about her bowel incontinence in December 2008 (Tr. p. 216), and she told Dr. Thrasher that radiation treatment

18

has caused bowel incontinence (Tr. p. 232). In January 2010, Muth-Willett complained of "loose stools, mild incontinence" and was diagnosed with "chronic diarrhea" (Tr. p. 257). However, no problems were ever found in Muth-Willett's gastro-intestinal tract, her rectum had normal tone and there were no fistulas in June 2008, and she has not been prescribed anything for bowel incontinence. Muth-Willett testified at her administrative hearing that she has uncontrollable loose bowels two to three times a day.

Although the ALJ evidently overlooked Muth-Willett's complaints of bowel incontinence during and after radiation treatment, the medical evidence does not support Muth-Willett's claim of disability due to bowel incontinence. Muth-Willett's radiation treatment evidently caused her bowel incontinence problems in 2008; since 2008, Muth-Willett sought treatment for bowel incontinence once. The only evidence that Muth-Willett suffered from uncontrollable loose bowels every day since June 2008 are her own self-serving statements and testimony. Muth-Willett has not testified that she lost weight due to diarrhea or that she has to wear an adult diaper. More importantly, no doctor has imposed any limitations on Muth-Willett's ability to perform work due to bowel incontinence.

Since Muth-Willett did not prove she suffers from severe bowel incontinence which limits her ability to work or prevents her from working, substantial evidence supports the ALJ's finding that Muth-Willett is not disabled by incontinence. The ALJ's credibility choices and finding that Muth-Willett's bowel incontinence would

19

not prevent her from performing work are proper. <u>Carry v. Heckler</u>, 750 F.2d 479, 485-86 (5th Cir. 1985). Muth-Willett has not shown prejudice from the ALJ's error in overlooking her 2008 medical records for bowel incontinence.

Muth-Willett also argues in her reply brief that the ALJ erroneously found she stopped working for reasons other than her allegedly disabling impairments. Muth-Willett testified that she stopped working due to complications with her pregnancy, which was cervical cancer. Since she does not now have cancer, the ALJ's finding is correct. Muth-Willett's argument that the cervical cancer treatment caused bowel incontinence which prevents her from working has already been dealt with above.

<u>Ground 4 - Medical Opinion Evidence</u>

Next, Muth-Willett contends the ALJ failed to properly evaluate the medical opinion evidence; she improperly rejected the opinion of Dr. Scott Cantwell and improperly relied on only part of Dr. Thrasher's opinion.

Muth-Willett contends the ALJ erred in dismissing Dr. Cantwell's finding that she "seemed to have some psychomotor retardation" during the physical exam on the ground that Dr. Cantwell is not a psychologist or psychiatrist. Psychomotor retardation refers to "slowed mental and physical processes characteristic of a bipolar depressive episode," <u>Gale Encyclopedia of Medicine</u> (2008)(at http://medical-dictionary.thefreedictionary. com/psychomotor+retardation), "a generalized slowing of motor activity related to a state of severe depression or dementia,"

20

<u>Mosby's  Medical  Dictionary</u>  (8th  ed.  2009)  (at  http://
medical-dictionary.thefreedictionary.com/ psychomotor+retardation),
and  "a  generalized  slowing  of  physical  reactions,  e.g.  eye-
blinking,  common  in  depression,"  <u>Miller-Keane  Encyclopedia  and</u>
<u>Dictionary of Medicine, Nursing and Allied Health</u> (7th ed. 2003) (at
http://medical-dictionary.thefreedictionary.com/psychomotor+
retardation).

Clearly, psycho-motor retardation is a mental disorder or a
symptom of a mental disorder.  As noted by the ALJ, Dr. Cantwell is
an internist, not a psychologist or psychiatrist.  Therefore, as
correctly stated by the ALJ, diagnosis of mental disorders is
beyond Dr. Cantwell's realm of expertise.  See F.R.E. rule 702.
Moreover, neither Muth-Willett's mental health care providers nor
the consulting psychologist, Dr. Thrasher, diagnosed psychomotor
retardation.  Therefore, the ALJ did not err in disregarding Dr.
Cantwell's non-expert diagnosis of psychomotor retardation.

Muth-Willet also contends the ALJ erred in disregarding Dr.
Thrasher's findings.  However, the ALJ stated that Dr. Thrasher had
noted Muth-Willett's ability to interact appropriately with co-
workers was uncertain; the ALJ's finding that Muth-Willett should
work with things rather than people reflects that.  It is noted
that Muth-Willett testified that she could work with others and
with the public.

Dr. Thrasher also found Muth-Willett is able to perform
detailed, complex work tasks, and she can maintain attention and
concentration to perform simple work tasks for two hours at a time,

but her ability to sustain effort and persist at a normal pace over a routine forty hour work week was uncertain.  Although Dr. Thrasher was "uncertain" about Muth-Willett's ability to work a forty hour work week, she did not find Muth-Willett cannot do that, and stated that her concentration, pace and persistence were good (Tr. p. 233).  No physician stated that Muth-Willett lacks the concentration, persistence and pace to do simple, repetitive work tasks for forty hours per week.  Therefore, substantial evidence supports the ALJ's finding that Muth-Willett can perform work.

This ground for relief is meritless.

Ground 5 - Mental Limitations

Muth-Willet also contends the ALJ's residual functional capacity assessment failed to properly account for her moderate limitations in social functioning and concentration, persistence, and pace.  However, the ALJ specifically found Muth-Willett should work with things rather than people and should perform only simple tasks, and included those limitations in her hypothetical to the VE.  Therefore, those limitations were fully accounted for in the ALJ's assessment of Muth-Willett's residual functional capacity.

This ground for relief is also meritless.

Ground 6 - Mental Health Records

Finally, Muth-Willett contends the ALJ failed to fulfill her duty to develop the record; she failed to obtain mental health treatment records for the 17 month period preceding her March 26, 2010 decision.  The last mental health treatment record in the administrative record is dated October 9, 2008.  However, Muth-

22

Willett's disability insured status expired after June 30, 2009, which is about eight months after the last mental health treatment record.

In any event, Muth-Willett has not alleged or shown how she was prejudiced by not having those records.  The ALJ's obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with the hearing procedure appears before him.  This duty requires the ALJ to scrupulously and conscientiously probe into, inquire and explore for all relevant facts.  The failure of the ALJ to develop an adequate record is not, however, ground for reversal per se.  As in the case of hearing held without waiver of the right to counsel, the claimant must, in addition, show that she was prejudiced as a result.  She must show that, had the ALJ done her duty, she could and would have adduced evidence that might have altered the result.  The duty does not exact a lengthy hearing or protracted inquiry.  It does exact a careful effort to make a complete record.  Kane v. Heckler, 731 F.2d 1216, 1219-20 (5th Cir. 1984), and cases cited therein.  Also, Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991); James v. Bowen, 793 F.2d 702, 704 (5th Cir. 1981).

Muth-Willett has not alleged what her mental health records would have shown.  Since Muth-Willett has not carried her burden of showing the missing eight months of mental health records might have altered the ALJ's decision, this ground for relief is also meritless.

Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Muth-Willett's appeal be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) CALENDAR DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this _____ day of May 2012.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE

24